UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MICHAEL SPIRO and<br>DEBORAH SPIRO<br>1151 Eagle Road<br>Upper Makefield, PA 18940<br><br>　　　　　Plaintiffs,<br><br>　　　　　v.<br><br>ALLIED BUILDING PRODUCTS CORP.<br>250 Route 17 North<br>East Rutherford, NJ 07073<br><br>　　　　　and<br><br>PLYGEM WINDOW COMPANY<br>5020 Weston Parkway<br>Fourth Floor<br>Cary, N.C. 27513<br><br>　　　　　Defendants. | Civil Action<br>Case No.:<br><br><br>**12-MEMBER JURY TRIAL<br>DEMANDED** |

## COMPLAINT

Plaintiffs, Michael Spiro and Deborah Spiro, by and through their undersigned counsel, Evan L. Frank, Esquire and the law firm of Alan L. Frank Law Associates, P.C., hereby file this Complaint against Defendants, Allied Building Products Corp. and Plygem Window Company, and in support thereof respectfully aver as follows:

### PARTIES

1.　Michael Spiro and Deborah Spiro are husband and wife and reside at 1151 Eagle Road, Upper Makefield, PA 18940.

2.　Allied Building Products Corp. ("Allied") is a New Jersey corporation with a principal place of business at 250 Route 17 North, East Rutherford, NJ 07073.

3. Plygem Window Company ("Plygem") is a Delaware corporation with principal place of business at 5020 Weston Parkway, Fourth Floor, Cary, N.C. 27513.

## JURISDICTION AND VENUE

4. This court has subject matter jurisdiction over this claim under 28 U.S.C. § 1332(a) because there is complete diversity of citizenship and the amount in controversy exceeds Seventy-Five Thousands ($75,000.00) Dollars.

5. Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to this claim occurred in this district.

## FACTS

**A. Introduction and Nature of the Case.**

6. This is a consumer fraud action. Plaintiffs Michael and Deborah Spiro purchased windows from Defendants Allied and Plygem to install in a home Plaintiffs were having built for themselves. Allied and Plygem made the following representations to the Spiros about the quality and features of the windows:

    A) The windows would have a 2 ½ inch brickmould. The Spiros informed Allied and Plygem that this feature was a deciding factor for the Spiros, in part because it would reduce the material and labor costs of installation.

    B) The brickmould would work with an arch-shaped top. The Spiros informed Plygem and Allied that the Spiros planned on installing windows with an arched top. Plygem and Allied assured the Spiros that arched windows would not be a problem, and even provided a sample in order to address the Spiros' concerns about windows with an arched top.

7. After purchasing and receiving the windows, the Spiros discovered that the windows were not as advertised. Allied and Plygem delivered windows with a 1 inch brickmould, instead

of the 2 ½ inch brickmould promised. When the Spiros raised this issue, Plygem and Allied responded that the 2 ½ inch brickmould promised would cost an additional $4,000 to $5,000. Plygem and Allied also informed the Spiros that 2 ½ inch brickmould was not possible with the windows the Spiros had purchased. Additionally, the Spiros discovered that the particular windows they received were defective. After installation, the Spiros experienced a large amount of water leaking through the windows into the home during rain. The water intrusion has caused extensive damage to the walls and floor of the new home. Upon inspection, the Spiros discovered that the windows contained little or no sealant between the glass and the frame. Plygem and Allied have refused to refund the Spiros purchase, provide suitable replacements, or compensate the Spiros for the resulting damages to the Spiros' new home.

8. As a result of Plygem and Allied's conduct, the Spiros have suffered damages, including:

    a) the cost of the defective windows;

    b) the cost of correcting the brickmould;

    c) damages to the walls caused by water leaks;

    d) damages to the floor caused by water leaks;

    e) future costs of replacing doors damaged by water leaks;

    f) future costs of replacing the defective windows.

9. The Spiros request judgment in their favor and against Allied and Plygem for violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, common law fraud, breach of contract, negligence, and strict products liability.

**B.  Background.**

10. Plaintiff Michael Spiro works as a professional contractor.

11. In April or March of 2011, a salesman for Allied, Bill Lutz ("Lutz"), visited Michael Spiro at a job site.

12. Lutz informed Michael Spiro that Lutz sold windows for Allied, which is a distributor for Defendant Plygem.

13. Lutz told Michael Spiro about Allied windows and inquired whether Michael Spiro had an interest in purchasing Allied windows.

14. Michael Spiro informed Lutz that Michael and Deborah Spiro were building a new home for themselves, and that they were interested in purchasing Allied windows.

### C.  Allied and Plygem's Representations about the Quality and Features of the Windows.

15. A few weeks later, Lutz again visited Michael Spiro at a job site.

16. Lutz brought with him an agent for Plygem, Mike Ceceri ("Ceceri").

17. Lutz also brought Allied's district manager, Philip Orapello ("Orapello").

18. Lutz, Ceceri, and Orapello told Michael Spiro about the windows that Allied and Plygem sold. Allied and Plygem's biggest selling feature was an integral 2 ½ inch aluminum brickmould, which would surround each and every window.

19. The Spiros explained to Lutz, Ceceri, and Orapello that 2 ½ inch brickmould feature was a critical factor for the Spiros, because it would save money in labor and material while simplifying the installation.

20. Michael Spiro inquired whether the arched windows in the future home would pose a problem.

21. Defendants assured the Spiros that the arched windows would not be a problem. Ceceri even provided the Spiros with a sample.

22. Over the next few months, Allied and Plygem corresponded with the Spiros.

23. The Spiros asked questions about the suitability of the windows and other products for their future home.

24. Meanwhile, Allied and Plygem touted the benefits of their windows, emphasizing the 2 ½ inch brickmould and suitability for arch-topped windows.

25. During this time, Allied and Plygem's agents sought to develop a rapport with the Spiros, on several occasions treating the Spiros to meals at restaurants in Philadelphia. At these meetings, the Spiros and Defendants talked about the Spiros future home and the products which the Spiros were considering purchasing from Defendants.

26. The Allied and Plygem representatives explained to the Spiros that they understood the significance of this potential purchase to the Spiros. In particular, the representatives explained that they understood that these products would be part of the Spiros' dream home, that the 2 ½ inch brickmould was a critical feature for the Spiros, and that the windows were suitable for an arched top.

27. The Spiros trusted the Allied and Plygem representatives, and believed that the representatives were looking out for the Spiros' best interests. The Spiros had no reason to doubt the authenticity of the Defendants' representations concerning the features of Defendants' products.

**D. The Spiros Purchase Windows from Allied and Plygem and Discover that the Windows are not as Advertised.**

28. On January 5, 2012, the Spiros placed an order with Allied and Plygem for several windows and other products to use in the Spiros' future home. Invoices are attached hereto as "Exhibit A." The combined purchase was about $31,000.00.

29. Around that time, construction started on the Spiros new home.

30. When the Spiros made the purchase, they believed that the windows would have all of the features touted by Defendants. The Spiros believed that the Allied and Plygem representatives understood the Spiros' concerns and goals. At that time, the Spiros had no reason to doubt the authenticity of Defendants' representations.

31. The windows and other products were delivered to the Spiros in March or April of 2012.

32. When the Spiros received the windows, they were surprised to learn that the windows and other products were not as Defendants had described.

33. In fact, the brickmould around the windows was 1 inch wide, rather than the 2 ½ inches promised.

34. The Spiros notified Allied and Ceceri of the problem.

35. Ceceri responded that 2 ½ inch brickmould would cost an additional $4,000.00 to $5,000.00.

36. Ceceri also informed the Spiros that arched windows were not possible with the products the Spiros had purchased.

37. Additionally, Plygem and Allied produced and delivered to the Spiros a French door in the wrong size, despite having blueprints indicating the correct size.

38. Ceceri asked Michael Spiro not to make an issue of the problems. Ceceri explained that Ceceri would likely lose his job if the Spiros complained.

39. The Spiros raised their concerns with the other Allied and Plygem representatives. The Spiros were repeatedly told that Allied and Plygem would not provide windows according to the

original specifications, or that Allied and Plygem would only provide replacements at a substantial cost to the Spiros.

40. The Spiros did not understand how the Allied and Plygem representatives, whom the Spiros trusted, could have been so wrong about the products they were selling.

41. The Spiros were faced with a dilemma – either continue with the construction with the inferior windows and other products, or delay the entire construction of their new home by about 6 weeks and invest a large amount of money in replacement windows.

42. Faced with the prospect of delaying the completion of their home and having to make an additional investment they could not afford on top of what was already a substantial investment, the Spiros were left with no choice but to continue construction with the inferior windows.

43. After installation, the Spiros noticed extensive flooding during rain through six of the windows purchased from Allied and Plygem.

44. Upon inspection, the Spiros discovered that the windows contained little or no sealant between the glass and the frame, and were not fit to be installed.

45. As a result of Defendants' conduct, Plaintiffs have suffered extensive damages, including:

    a)      approximately $31,000.00 in the cost of the windows;

    b)      approximately $22,000.00 to correct the brickmould;

    c)      approximately $3,000.00 to repair water damage to the walls of the home;

    d)      approximately $6,000.00 water damage to the floor of the home;

    e)      future costs of replacing doors damaged by water leaks.

    f)      future costs of replacing the defective windows.

The Spiros have obtained a quote to replace the defective windows for $134,065.00 and the defective doors for $37,517.00. After a courtesy discount, the total quoted price for replacing the defective windows and doors is $119,249.00. Documents reflecting the quoted price and discount are attached hereto as "Exhibit B."

46. As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered damages.

## COUNT I
## VIOLATIONS OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW

47. Plaintiffs incorporate by reference the foregoing paragraphs as though the same were set forth herein.

48. The Act prohibits deceptive acts and practices, including but not limited to passing off goods or services as those of another; causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services; advertising goods or services with intent not to sell them as advertised; failing to comply with the terms of any written guarantee or any warrantee given to the buyer at, prior to, or after a contract for the purchase of goods or services is made; and engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.

49. The following acts, uses or employments by Defendants constitute unfair or deceptive acts or practices and are unlawful under the Act:

   1) Misrepresenting to Plaintiffs that Defendants' windows had a 2 ½ inch brickmould surrounding each and every window, when in fact each window had a 1 inch brickmould.

2) Misrepresenting to Plaintiffs that the windows were suitable for an arched top, when in fact the windows were not suitable for an arched top.

3) Selling Plaintiffs a French door of the wrong size.

4) Selling Plaintiffs windows that were materially defective and unfit for installation in a home due to little or no sealant between the glass and the frame.

5) Failing to refund Plaintiffs' purchase or provide suitable replacements after Plaintiffs' complained about these problems.

50. Upon information and belief, Defendants made the above misrepresentations to Plaintiffs knowingly, with intent to induce Plaintiffs to rely on the misrepresentations in purchasing Defendants' products.

51. Plaintiffs reasonably relied on Defendants' misrepresentations to Plaintiffs' detriment.

52. As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered damages.

## COUNT II
## COMMON LAW FRAUD

53. Plaintiffs incorporate by reference the foregoing paragraphs as though the same were set forth herein.

54. Defendants made written and oral misrepresentations to the Spiros concerning the nature, quality, and features of windows and other products.

55. Defendants knew or believed that their representations to the Spiros were false.

56. Defendants' misconduct included the following:

9

1) Misrepresenting to Plaintiffs that Defendants' windows had a 2 ½ inch brickmould surrounding each and every window, when in fact each window had a 1 inch brickmould.

2) Misrepresenting to Plaintiffs that the windows were suitable for an arched-top brickmould, when in fact the windows were not suitable for an arched-top brickmould.

3) Selling Plaintiffs a French door of the wrong size.

4) Selling Plaintiffs windows that were materially defective and unfit for installation in a home due to little or no sealant between the glass and the frame.

5) Failing to refund Plaintiffs' purchase or provide suitable replacements after Plaintiffs' complained about these problems.

57. Defendants made the false representations to the Spiros with the intention that the Spiros would rely on those false representations.

58. Plaintiffs reasonably relied on Defendants' false representations to Plaintiffs' detriment.

59. As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered damages.

## COUNT III
## BREACH OF CONTRACT

60. Plaintiffs incorporate by reference the foregoing paragraphs as though the same were set forth herein.

61. Plaintiffs and Defendants entered into a legally binding contract, under which Defendants promised to provide windows and other products consistent with the representations Defendants' made to Plaintiffs.

62. Defendants were legally obligated to provide products with the specified features.

63. Defendants breached their contractual duties by failing to provide windows and other products meeting the promised specifications.

64. As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered damages.

## COUNT IV
## NEGLIGENCE

65. Plaintiffs incorporate by reference the foregoing paragraphs as though the same were set forth herein.

66. Defendants owed Plaintiffs a duty to exercise reasonable care in preparing windows for Plaintiffs.

67. Defendants were negligent in failing to prepare the windows according to their promised specifications.

68. Defendants were further negligent in failing to apply enough sealant to make the windows suitable for installation.

69. As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered damages.

## COUNT V
## STRICT PRODUCTS LIABILITY

70. Plaintiffs incorporate by reference the foregoing paragraphs as though the same were set forth herein.

71. The windows Defendants supplied to Plaintiffs were materially defective and likely to cause damage to the Spiros' new home by water leaks.

11

72. The windows were defective, either as a result of a manufacturing error which resulted in insufficient sealant; or as a result of a defective design which resulted in insufficient sealant.

73. Plaintiffs installed the defective windows in their home, unaware that the windows had no sealant or insufficient sealant.

74. The windows' defect caused the windows to leak during rain, which caused extensive water damage to the walls and floor of Plaintiffs' home.

75. Defendants are strictly liable for the property damage caused by their defective products.

76. As a direct and proximate result of Defendants' conduct, Plaintiffs has suffered damages.

**WHEREFORE,** Plaintiffs, Michael Spiro and Deborah Spiro, demand judgment and relief against Defendants, jointly and severally, as follows:

a) an award of compensatory damages in excess of $181,249.00;

b) an award of treble damages for Defendants' willful, wanton, and outrageous conduct in accordance with the Pennsylvania Unfair Trade Practices and Consumer Protection Law;

c) an award of reasonable attorney fees and costs incurred by Plaintiffs in this civil action in accordance with the Pennsylvania Unfair Trade Practices and Consumer Protection Law;

d) an award of prejudgment interest;

e) such other relief as this Honorable Court may deem just and proper.

Respectfully submitted,
ALAN L. FRANK LAW ASSOCIATES, P.C.

_____
Evan L. Frank, Esq.
135 Old York Road
Jenkintown, PA 19046
215-935-1000
215-935-1110 (fax)
afrank@alflaw.net
*Attorney for Plaintiffs*

Dated:  March 25, 2013

## **DEMAND FOR 12-MEMBER JURY TRIAL**

Plaintiffs demand a 12-member jury trial.

ALAN L. FRANK LAW ASSOCIATES, P.C.

_____
Evan L. Frank, Esq.
135 Old York Road
Jenkintown, PA 19046
215-935-1000
215-935-1110 (fax)
afrank@alflaw.net
*Attorney for Plaintiffs*

Dated: March 25, 2013

13